Good morning, Mr. Taddonio. I see you reserved two minutes for rebuttal, and you can begin whenever you're ready. Mr. Taddonio Excellent. Thank you, Your Honors. I'm here today to appeal the decisions made by the SEC and FINRA, which impose severe sanctions on me without proper consideration of the facts, evidence, or a fair process. First, I respectfully submit that FINRA and the SEC unfairly dismiss critical mitigating factors. Over the years, I took numerous steps to strengthen compliance and supervision at my firm. CSC, despite this, FINRA excluded our clean cycle exam letters, which would have shown a solid compliance record. Instead, they mischaracterized evidence and disregarded the actions my firm and our supervisors took to address compliance issues. Second, there was a mishandling of crucial evidence in my case. I feel the NAC included a default judgment against CSC that was irrelevant to my individual sanctions, prejudicing the process. Additionally, FINRA relied on testimony from witnesses who later admitted they were not truthful. Despite this, their statements were used to justify a lifetime ban for me, a punishment that should be reserved for the most severe offenses. In my case, it was unjustified. I also need to address the claim of false testimony regarding the use of recording devices at my firm. FINRA concluded that I lied under oath about recordings, but this determination mischaracterizes both my testimony and the context of my statements. Throughout my testimony, I clearly stated that CSC, as a firm, did not have a system to record customer calls, which we did not. Any recordings that were made were made by individual brokers on their own devices, not by a firm-wide system, as FINRA suggested. But Mr. Milano testified, this is in special, the subsequent appendix 496, that you encouraged him to record statements, that you were present when he played recordings to you. So whatever your, there was testimony to support their finding that you lied when you said that the staff did not record calls with customers, right? So the staff did not record calls with customers, and if you look at the questions I was asked, I just read you Mr. Milano's testimony. Didn't he say they recorded calls with customers and he played them back to you and you encouraged him to do that? So again, the questions were all related to the firm. This stemmed from a broker, Zachary Bader, who stated over and over again that the firm had a recording system which automatically recorded all calls. I was then asked multiple times, did the firm record calls of its brokers? Did the firm record calls? But you were also asked, did anyone, to your knowledge, at the firm ever use any devices and or technology to record conversations with brokers? Did anyone use? This is not a firm-wide question, right? So, and so I'll, I'll, I'll explain to you why it is a firm-wide question, because if you look, grammatically speaking, that question would be impossible to state that if anyone at the firm recorded calls of its brokers if they weren't talking about the firm specifically. So for example, again, the testimony went on for a while that Zachary Bader had stated that there was a firm-wide recording system at the firm. I was then asked multiple times, did the firm record calls of its brokers? Did anyone at the firm record calls of its brokers? Did anyone at the firm record calls of its trainees? But again, no one at the firm recorded calls of brokers. I even then went on to state that if Milano recorded a call, that he recorded the call. We did not record calls of our brokers. If a broker recorded a call, I even stated further that I had a recorder in the past, because at the prior firm we were at, prior firms, we were required to record the first call with a client to show a good order. I then stated that later on, that was no longer a requirement. So although I think some brokers still did record calls at times, over time it was far less, and I didn't even know if it was really done any longer. And you could see in the, the server was recorded, and the last recording that had been done was 14 months prior to my on-the-record. I still don't understand why it wasn't incorrect when you answered no to the question, did anyone, to your knowledge at the firm, ever use any devices or technology to record conversations with brokers? Because... Because people did, right? So brokers recorded calls with, with their clients, but the firm never recorded calls of its brokers. And the questions were all related to, did the firm, and you can see it because it even... Did you record conversations with prospective customers? Did anyone at the firm ever use any devices to record conversations with prospective customers? Again... Individuals do that. So brokers recorded calls with their clients, but the line of questioning was continuously, each question began with, did the firm record calls of its trainees? No. Did the firm record calls of its customers? Did the firm record calls of its brokers? It's physically impossible that the question could be, did brokers record calls of brokers? That, that question wouldn't make grammatical sense. You see what I'm saying? So yes, there were follow-up questions that could be interpreted. I heard the question was whether brokers have calls with their customers. I just heard that's the question. But I think your time, time is up. You can, you can use your rebuttal time. All right, thanks. Understood, appreciate it. All right, we'll hear from the SEC, Ms. Wagner. And you know what, I'm so sorry. So, and I apologize. I thought my time would be related to my questions, but if I was asked questions, do I give up that time as well? Yeah, we're allowed to ask questions. No, of course, I wasn't sure if it affected my time. Again, I'm not an expert, so I'll give you a minute, but you have your two minutes for rebuttal, all right? All right, thank you so much. I appreciate it. Good morning. May it please the Court, Brooke Wagner for the SEC. Ample evidence supports the Commission's conclusion that brokers at CSC excessively traded in customer accounts at rates 20, 30, 40 times those that indicate excessive trading, and that Mr. Tedonio, CSC's president, failed to adequately supervise or address the obvious misconduct. Substantial evidence, likewise, supports the Commission's finding that Mr. Tedonio gave false testimony to FINRA, and I think in that regard the testimony speaks for itself. The Commission then reasonably determined that given the egregious conduct, an associational bar was warranted. On appeal, Mr. Tedonio raises a host of grievances, but none of those grievances, many of which are waived or barred, can call into question the fairness of the proceedings, the copious evidence of misconduct, or the need to protect investors. So as to the evidence, I was concerned about how the discovery went, and I gathered that there was a delay in making any objections to its accessibility and to passwords and so on. Nonetheless, it's in the order of 5 million pages of documents that maybe they had access to, otherwise maybe not, but that's a huge volume, and they say it was just bait and stamped and not easily searchable. And, you know, again, I acknowledge that you have been arguing about delay in requesting help, but is that consistent with the SEC's general process to just, you know, do a document dump on the people who are being prosecuted? Well, I'm not sure that the record would support that FINRA just did a document dump. I think — and again, the question here is whether FINRA provided a fair process, and I think the record shows that throughout it did. So at the outset, FINRA provided its entire file to both petitioners and counsel at the time, and my understanding is that it was provided, I mean, consistent with the way that these productions are provided, so with things in their respective native formats, and that there was no issue raised by the counsel at that time about their ability to use that. Obviously, then, both petitioners ultimately proceeded pro se, and counsel withdrew. And so it was only until the very eve — at the very eve of trial that any issues were raised about the discovery not being accessible. But I would note that at that point, they had also received a subset of the most relevant materials, and that as the hearing panel noted, in a case like this, there are a relatively narrow set of materials that are really critical to the issues at play in a churning failure-to-surprise case. I believe that in Mr. Teranio's brief, he says that he received access and passwords to certain of those materials only after the hearing was completed. Is that correct? I don't think the record is clear on that. I think the testimony from FINRA's IT support said that he was providing support, that there are a number of different passwords, and he was providing those passwords in advance, you know, to access zip files. They were offering to send materials through different media. I think the record on that, it's far from clear that that was the case. But in any event, that's why the hearing panel, in an abundance of caution, held the record open for an additional 30 days, ordered FINRA to host the petitioners for a week in their offices, and offer them the opportunity to introduce any other documents or recall any witnesses. And by the time that that accommodation was made, is it your understanding that Mr. Teranio would have had complete access and accessibility via passwords and whatever other tools to that data set? I believe that would be the case, but again, that's why it was done in an abundance of caution, just in case there were any continuing issues with access. Okay, thank you. Thank you. Unless there are any further questions, we'll rest our case. All right, thank you. Mr. Teranio, you have two minutes or more to go. Thank you very much. I believe your description was actually perfect, Your Honor. It was most definitely a document dump. There were over 5 million pages of documents. They were simply bait stamps. They were not searchable. We had an attorney for... But what categories of documents might have been useful to you in those things? I mean, I would have expected that you would have access, that those documents would be your own, basically, your company's own, and that you would be familiar with them. So I'm puzzled by your inability, apparently, to identify a category that you think would have been really crucial to your defense. So I could definitely identify some categories. One would certainly be statements from other firms. So, for example, one of the big issues in this case was whether or not ETNs... One of the clients stated that he had never traded an ETN, and one of the findings was that he wasn't suitable for ETNs. However, in multiple documents that I did find after the hearing was over, and to answer that question, there were 53 passwords and 11 software applications, which were provided nine days after the hearing was over. How far in advance did you ask for those passwords? So I didn't even know they existed. You know, keep in mind, these are documents that we then attempted to open and were unable to, and then later, FINRA provided us with a list of 53 passwords and 11 different software applications, which we discovered while we were at their offices. But hadn't they provided you the document set like a year ahead of time? So they provided the documents. However, there were so many documents, it was physically impossible to open every document. And then when we did sit in their offices, we then realized, and they realized, that there were numerous documents that couldn't be opened at all because there were certain software applications, 11 of which needed to be opened, and 53 different passwords that needed to be used to open those. So the category of documents that you think would have helped you in your defense is what? So one would certainly be confirmations that we weren't able to access. The other would be, because remember, those come from the clearing company, not from the firm. So one thing we weren't able to get was confirmations. And one of the major arguments in this case was what was on the confirmations. Because the main argument in the case, compliance-wise, the clients agreed, you know, they agreed to every trade. They knew about every trade. They spoke to their clients regularly. They didn't have an issue with their losses. They thought they were paying $99 a commission per trade. And the confirmations, many of which showed a $99 firm commission plus an additional agency commission on it, but others showed a markup or markdown. I don't understand. Didn't you have access to those in that 30-day period after the hearing? You could supplement the record? Did you have... So we attempted to, but there were so many documents, there was just no way to do it within the 30 days. I did submit 20 additional documents, some of which were the confirmations, for example. But you could have asked for more time if you couldn't get through all the documents, but you've asked the panel for an additional 30 days to... I asked the panel multiple times for additional timing everywhere and was turned down often. So... At that point. I don't recall if I did ask for additional time at that point. But one of the things I did find was certainly that in the confirmations, for example, many of the clients were doing the exact same trading in other accounts, which I stated in my brief. And I think more of those confirmations certainly would have helped, as well as confirmations from the company, which we weren't able to access. And certainly other documents that we weren't able to pull up, which may have existed in a firm file somewhere, but I didn't have the filing cabinet in front of me. I had what the document of production was. All right. Thank you very much to both of you. We'll reserve the session. Have a good day. Thank you very much.